IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BERNARD CAMPBELL,                      *

    Plaintiff,                         *

v.                                     *          Civil Action No. GLR-22-1893

WARDEN, et al.,                        *

    Defendants.                        *

                  ***

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Defendant Warden Robert Dean's Motion to Dismiss or, Alternatively, for Summary Judgment (ECF No. 19),[1] Defendants YesCare Corp., Corizon Health, Inc.,[2] and Dr. Kasahun Temesgen's[3] Motion to Dismiss or, Alternatively, for Summary Judgment (ECF Nos. 38, 39), and self-represented Plaintiff Bernard Campbell's Motion to Dismiss (ECF No. 57). The Motions are ripe for disposition,

---

[1] The docket lists "Warden" and Warden Robert Dean as Defendants. The Complaint is dismissed as to Warden, as Warden Robert Dean is the proper name for this Defendant. The Court notes that this case was previously terminated as to Dr. Robert Williams, and it will direct the Clerk to terminate Williams from the docket. (April 24, 2023 Order at 1, ECF No. 45).

[2] The case has been stayed as to Corizon Healthcare. (March 8, 2023 Order at 1, ECF No. 41). As such, the Motion filed on their behalf is improper and will not be considered. Further, Robert Williams, M.D. is listed as a Defendant on the docket. However, by Order dated April 24, 2023, the Clerk was directed to, among other things, terminate the case as to Williams. (ECF No. 45). As such, the Clerk is further directed to amend the docket to reflect that the case is terminated as to Robert Williams, M.D.

[3] The Court shall refer to YesCare and Temesgen collectively as "Medical Defendants."

and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2023). For the reasons set forth below, the Court will grant the Defendants' Motions.

## I.   BACKGROUND[4]

### A.   <u>Campbell's Allegations</u>

Campbell alleges that he has been denied proper and timely medical treatment and pain medication. (Compl. at 1, ECF No. 1). He alleges that Defendant Dr. Kasahun Temesgen is part of Utilization Management ("UM") and has not approved him to see a urologist regarding issues with his right testicle. (<u>Id.</u>). In April of 2022, an ultrasound showed that Campbell had a small hydrocele which causes pain and the accumulation of fluid in his testes. (<u>Id.</u>).

In a Court-directed Supplemental Complaint, Campbell explains that he has been complaining about the issue with his testicles since 2014. (Supp. Compl. at 5, ECF No. 3). Campbell says that in December of 2021, he was provided antibiotics for the pain. (<u>Id.</u>). In February of 2022, a consultation request was submitted for Campbell to get an ultrasound, which was performed on April 7, 2022 at University Hospital. (<u>Id.</u>). Dr. Robert Williams consulted with Campbell on May 16, 2022, explained the results of the ultrasound, and advised that Campbell would receive "stronger" antibiotics to treat the hydrocele. (<u>Id.</u>). Campbell received the antibiotics on June 5, 2022, but they did not resolve the issue. (<u>Id.</u>).

---

[4] Unless otherwise noted, the Court takes the following facts from Campbell's Complaint or Supplemental Complaint (ECF Nos. 1, 3) and accepts them as true. <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007).

On July 28, 2022, Campbell had a telephone consultation with Temesgen regarding a referral to a urologist, but Temesgen denied the request. (Id. at 5−6).

Campbell also alleges that he has been writing sick call slips since 2019 regarding severe neck pain. (Id. at 7). Campbell reports that it took over eight months to receive an x-ray. (Id.). After the x-ray, Campbell requested an MRI. (Id.). At that time, COVID-19 infections were common, and Campbell tested positive on December 16, 2020. (Id.). Sometime thereafter, Campbell was transferred to Jessup Correctional Institution ("JCI") where he again complained about neck pain. (Id.). Campbell advised Dr. Hamid Kiabayan of the pain which radiated down his shoulder and arms and caused numbness in his fingers. (Id.). On September 15, 2021, "medical provider Bernard" advised Campbell that he would not recommend an MRI, but he increased Campbell's pain medication, Neurontin. (Id. at 8). On October 15, 2021, Campbell advised Williams about his neck pain and again requested an MRI. (Id.). Williams advised that he would request an MRI, but did not believe that Dr. Temesgen and UM would approve it. (Id.). On July 28, 2022, Williams and Temesgen met with Campbell. (Id. at 9). Campbell explained to Temesgen that: (1) his prescription for Ultram/Tramadol[5] had been discontinued without weaning him off; (2) the antibiotics did not resolve his testicular issues; and (3) he wanted to determine the cause of his neck pain. (Id.). After the meeting, Campbell's prescription for Ultram/Tramadol was

---

[5]Ultram and Tramadol are the brand and generic names of this medication and used interchangeably throughout the records provided to the Court. Similarly, Gabapentin and Neurontin are the brand and generic names of another medication prescribed to Campbell and used interchangeably throughout the records provided to the Court. For ease of use, the Court refers to each of them using both names.

reinstated, but no other relief was provided. (Id.). Campbell alleges that Temesgen was trying to save money which is why he would not approve the referral to a urologist or for an MRI.[6] (Id.).

Next, Campbell explains that he was prescribed Ultram/Tramadol in June of 2019. (Id. at 10). On May 17, 2022, Campbell was advised that his prescription had been discontinued. (Id.). Campbell submitted an administrative remedy procedure ("ARP") complaint, which was dismissed because his prescription expired on May 16, 2022 when Temesgen refused to renew the prescription. (Id.). Campbell explains that Temesgen is aware that he suffers from a hereditary progressive muscle disease known as Charcot Marie-Tooth, which causes severe pain and loss of mobility in the extremities. (Id.). Campbell's prescription for Ultram/Tramadol did not need to be renewed until June 30, 2022, and he attributes the discontinuation of the medication to the fact that YesCare took over the provision of institutional medical care for Corizon on the date his prescription was discontinued. (Id.). Campbell also notes that Temesgen renewed his prescription in July, showing that Campbell still suffered from chronic pain. (Id. at 11). In his Opposition, Campbell states that in response to his ARP complaint, Warden Dean responded that, "according to medical staff, your medication expired on 5-16-2022 a decision was made by RMD (Regional Medical Director) to not approve the order Ultram. RMD reviews

---

[6] In his Opposition, Campbell explains that on February 23, 2023, he had an MRI of his cervical spine which revealed mild cervical spine disease. (Opp'n Med. Defs.' Mot. Dismiss ["Opp'n Med. Defs.' Mot."] at 2, ECF No. 47).

EPHR and made a determination that this medication was not medically indicated at this time." (Opp'n Med. Defs.' Mot. at 2; Resp. ARP Compl. at 1, ECF No. 47-2).

Lastly, Campbell alleges that he requires a long-handled toothbrush. (Supp. Compl. at 12). On June 14, 2022, a dental provider advised Campbell that his teeth were sensitive because his toothbrush was too hard, and his enamel was weakening. (Id.). The dental provider stated that a long-handled toothbrush would be beneficial for Campbell's oral hygiene. (Id. at 12−13). Campbell could not brush his teeth with the short-handled toothbrush provided to the entire prison. (Id. at 13). In his Opposition, Campbell provides evidence that he wrote an ARP complaint regarding the denial of a long-handled toothbrush. (Toothbrush Compl. Docs. at 1, ECF No. 27-1).  In denying his appeal to the Inmate Grievance Office, Campbell was advised that long-handled toothbrushes were "removed from the allowable property matrix in 2018" due to security concerns. (Id. at 6).

## B.   **Warden Dean's Response**

Warden Dean avers that he had no involvement with the medical decisions regarding Campbell and did not direct or interfere with any medical treatment regarding Campbell. (Dean's Decl. ¶ 5, ECF No. 19-2). Dean explains that medical services are provided to inmates at JCI by private medical contractors and that he does not have any personal involvement with the provision of medical care to any inmate. (Id. ¶ 2). Dean states that he does not have the authority to order medical staff to perform a particular procedure or render a particular treatment. (Id.). Dean adds that when responding to inmates' complaints regarding medical care, he relies on the reports and judgments of medical staff. (Id. ¶ 4).

C.    **Medical Records**

Medical Defendants explain that Campbell has "a history of CMT disease," a hereditary sensorimotor polyneuropathy. (Temesgen Decl. ¶ 8, ECF No. 38-3). On May 22, 2019, Dr. Harjit Bajaj evaluated Campbell at Bon Secours Hospital for his CMT disease. (Id.). Campbell reported his symptoms were worsening and he was losing muscle in his hands and feet. (Id.). Examination showed Campbell had normal strength in his upper extremities but significant muscular atrophy, especially in his hands. (Id.). He demonstrated weakness in both legs and foot drop on both sides. (Id.). He could move his legs but could not walk and used a wheelchair. (Id.). Reflexes were absent in the biceps, triceps, ankle, and knee. (Id.). Bajaj advised that Campbell suffered from a hereditary progressive sensorimotor polyneuropathy and that there was no treatment except to manage the symptoms. (Id.). As such, Bajaj continued Campbell's prescriptions for Ultram/Tramadol and Neurontin/Gabapentin for pain and numbness. (Id.). Additionally, Bajaj recommended more physical therapy and wheelchair use. (Id.).

On June 24, 2019, a medical provider at Western Correctional Institution ("WCI") where Campbell was then housed, wrote an order for a single cell for one year. (Id. ¶ 9). On August 9, 2019, Campbell received a wheelchair. (Id.). The following week, Campbell received bilateral ankle foot orthoses. (Id.). On October 18, 2019, due to Campbell's ascending CMT disease, CRNP Janette Clarke wrote an order that Campbell be provided with the following for one year: a long-handled toothbrush, a wheelchair, a wheelchair pusher for distance, a cane, bilateral AFO leg braces, foam tubing/adaptive build up for

toothbrush and utensil handles, a handicap cell, and a handicap shower. (Id.). On December 24, 2019, Campbell signed a receipt for handle foam. (Id.).

On January 13, 2020, a consultation request was submitted for occupational therapy due to Campbell's CMT disease, which caused moderate to severe atrophy of both hands and wrists. (Id. ¶ 10). The provider noted that according to statewide DPSCS policy, Campbell was not permitted to have a long-handled toothbrush due to safety concerns. (Id.). It was further noted that Campbell had access to a short-handled toothbrush, but he could not complete oral care because he could not hold on to it. (Id.). The provider requested evaluation by occupational therapy to make an adaptive handle that could be used with a short toothbrush. (Id.). The request was approved by UM on January 15, 2020. (Id.). On October 29, 2020, Karen Glass RN noted that Campbell returned from occupational therapy, but they needed his short-handled toothbrush, which had not been sent with him, and so he needed to be rescheduled. (Id.). The consult was updated on November 15, 2020. (Id.). On December 8, 2020, it was noted that "Rehab 1st" was not able to make the requested part. (Id.). On May 26, 2020, Campbell signed for a wheelchair. (Id. ¶ 11).

On October 12, 2020, given Campbell's continuing CMT disease, a provider wrote an order that Campbell be provided with the following for one year: a long-handled toothbrush, a wheelchair, a wheelchair pusher for distance, a cane, bilateral AFO leg braces, foam tubing/adaptive buildup for toothbrush and utensil handles, a lower-tier cell, and a bottom bunk. (Id. ¶ 12).

Campbell was evaluated by occupational therapist Ryan Adams on February 3, 2021. (Id. ¶ 13). Campbell reported weakness in both hands that prevented him from

holding a toothbrush and other utensils. (Id.). Adams noted that because Campbell is incarcerated, adaptive equipment must be approved by correctional officers before being distributed. (Id.). Campbell reported that the toothbrush he used was small and difficult to grasp. (Id.). He also reported difficulty and pain with other basic activities of daily living ("ADL"). (Id.). Adams educated Campbell regarding his findings, plan of care, and adaptive equipment. (Id.). A home exercise program was provided. (Id.). Additionally, correctional staff were provided with "built-up foam material" for Campbell to be able to increase his independence and brush his teeth. (Id.).

On February 6, 2021, during a provider visit, Campbell reported that his back and hand pain had worsened, and his current pain regimen was not effective. (Id. ¶ 14). He also asked about an x-ray of his back. (Id.). Given Campbell's chronic neuropathy and worsening back and hand pain, the provider believed that he would benefit from an increase in Ultram/Tramadol, which she ordered. (Id.). She also renewed his prescription for Neurontin/Gabapentin. (Id.). On February 7, 2021, NP Clark updated Campbell's chart and noted that he was prescribed a high dose of a controlled substance—Ultram/Tramadol— for chronic pain due to ascending CMT disease and that he was also prescribed two daily 1200 mg doses of Neurontin/Gabapentin. (Id. ¶ 15). A lab draw was ordered to confirm that Campbell was taking his controlled substance medication as prescribed, but Campbell refused the test. (Id.). Campbell also refused a lab draw to check drug levels in November 2020. (Id.).

Campbell was transferred from WCI to JCI on February 11, 2021. (Id. ¶ 16). Dr. Kiabayan evaluated Campbell on March 19, 2021. (Id. ¶ 17). Campbell complained of neck

and back pain and requested a replacement strap and pad for his ankle/foot orthotic. (Id.). He also requested a pillow for his neck pain. (Id.). Kiabayan explained that a pillow was not under the control of the medical team. (Id.). He reviewed Campbell's recent labs and renewed Campbell's medications for four months. (Id.). Kiabayan submitted a consultation request for replacement of the strap and pad for the orthotics which Campbell received on April 1, 2021. (Id.).

Kiabayan evaluated Campbell again on July 9, 2021. (Id. ¶ 18). Campbell complained of chronic and worsening back pain and reported that he was using his wheelchair. (Id.). Campbell requested to increase the dosage of his pain medications. (Id.). Kiabayan renewed the pain medication for four months, but he explained that Campbell was already on a high dose and an increase was not advisable. (Id.). He advised Campbell to do stretching and core exercises and to avoid sitting in his wheelchair all day. (Id.).

NP Alenda evaluated Campbell on September 15, 2021 for a sick call. (Id. ¶ 19). Alenda noted Campbell had cervical spine stenosis, CMT disease, was in a wheelchair, and had complaints of pain worsening in the left arm and shoulder. (Id.). Campbell described the pain as pins and needles, and Alenda noted that Campbell had muscular atrophy from CMT. (Id.). Campbell had active prescriptions for Ultram/Tramadol, and Alenda added 20 mg Baclofen, a muscle relaxer, for neuropathic pain. (Id.). On October 1, 2021, Alenda saw Campbell at another a sick call. (Id. ¶ 20). Campbell reported worsening pain which he described as constant and "ten out of ten." (Id.). Campbell had active prescriptions for Ultram/Tramadol, Neurontin/Gabapentin, and Baclofen. (Id.). Campbell said the Baclofen

caused stomach irritation, so Alenda discontinued it and increased the prescription for Neurontin/Gabapentin to 600 mg, three times a day. (Id.).

Dr. Williams examined Campbell for chronic care on October 15, 2021. (Id. ¶ 21). Williams noted Campbell's history of CMT and that he reported numbness and pain in both upper extremities, particularly on the left side, and that he suffered chronic pain in the lower extremities, neck, and back. (Id.). Campbell had severe muscle wasting in both lower extremities. (Id.). Williams continued Campbell's prescriptions for Ultram/Tramadol 50 mg, 2 tablets twice a day. (Id.). Campbell reported that he had adequate pain relief with this regimen. (Id.).

On December 8, 2021, Campbell attended a sick call in which he requested an adjustment of his Neurontin/Gabapentin dosing. (Id. ¶ 22). Campbell's current prescriptions were reviewed, and he was directed to raise the issue at his next chronic care visit. (Id.).

Podiatrist Dr. Michael Berger evaluated Campbell on December 27, 2021, for an at-risk/wheelchair evaluation. (Id. ¶ 23). Campbell was wheelchair dependent due to CMT and he reported difficulty inspecting and reaching his lower extremities. (Id.). He denied any open lesions and advised that his pain was controlled with Neurontin/Gabapentin. (Id.). Berger ordered monthly evaluations, performed at-risk foot care, and advised Campbell to continue the use of Neurontin/Gabapentin for neuropathic pain. (Id.).

On December 30, 2021, Campbell was seen for another sick call. (Id. at ¶ 24). He reported pain on and off in his left testicle for many years and denied experiencing

abnormal discharge from his penis, rash, lesions, fever, or chills. (Id.). The nurse practitioner ordered an antibiotic. (Id.). He was seen again on January 25, 2022 regarding his complaints of pain in the right testicle, which he reported had been ongoing for eight years. (Id. ¶ 25). The provider noted that he had been seen at various times with findings for orchitis and hydrocele. (Id.). Campbell reported that the pain was more frequent and intense over the last two months. (Id.). Examination revealed a bean-size, freely-moving swelling in the right testicular sac, consistent with a testicular cyst. (Id.). The nurse practitioner submitted a consultation request for Campbell to be seen by a urologist. (Id.).

Dr. Bartels, the UM Physician Reviewer, responded to the consultation request and he indicated more information was needed, including a current scrotal examination. (Id.). UM was advised that Campbell had a 0.5 cm x 1.5 cm freely-moving swelling in the right testicular sac consistent with a cyst where the pain was located. (Id.). The next day, Bartels created an alternative treatment plan ("ATP") stating that the medical necessity for a urologist referral had not been established. (Id.). Bartels noted that the examination provided no evidence of an intratesticular mass that typically required imaging and given that Campbell's testicular pain was a chronic complaint over eight years, she would consider reviewing Campbell's record to ensure diagnostic imaging had not been done in the past. (Id.). Campbell was later informed that the consultation request was not approved. (Id.).

Dr. Kiabayan evaluated Campbell on February 10, 2022. (Id. ¶ 26). Campbell advised that he had a right testicular cyst for eight years and that over the past two months it had enlarged and caused discomfort and tenderness with touch. (Id.). Kiabayan noted that

UM had denied the request to see a urologist and recommended an ultrasound if one had not already been done. (Id.). Kiabayan also renewed Campbell's medications and submitted a consultation request for a right testicular ultrasound. (Id. ¶¶ 26–27). UM Physician Reviewer Dr. Dorsey initially returned an ATP but on March 22, 2022, the case was reviewed, the ATP overturned, and an ultrasound approved. (Id.).

Campbell was seen by a nurse practitioner on February 23, 2022. (Id. at ¶ 28). It was noted that the prior request for urology consultation resulted in an ATP stating the need for the referral was not met. (Id.). Campbell again complained of discomfort and reported urinary hesitancy. (Id.). A urinalysis and urine culture were ordered. (Id.).

On April 7, 2022, Campbell had a scrotal ultrasound. (Id. ¶ 29). The radiologist determined the ultrasound was unremarkable, although a right epididymal tail focused of heterogenous dystrophic calcification, likely from a prior infection, was noted. (Id.).

Dr. Williams evaluated Campbell on May 16, 2022, and reviewed the results of the ultrasound. (Id. ¶ 30). Campbell was reassured that the ultrasound showed no serious abnormalities. (Id.). He was offered antibiotics for his scrotal pain and tenderness. (Id.). As to Campbell's CMT disease, Campbell was wheelchair bound with all four extremities severely affected and Williams continued Campbell's medication until September 16, 2022. (Id.).

On July 12, 2022, Campbell was seen in a sick call. (Id. ¶ 31). Campbell again reported recurrent testicular pain and requested to see a specialist. (Id.). He reported that the medications were not effective for his infection. (Id.). His prescriptions for pain

medication were active. (Id.). He denied dysuria, blood in the urine, urinary hesitancy, or urgency. (Id.). He was assessed as suffering from testicular pain and referred to his chronic care provider for follow up. (Id.). The results of the ultrasound were again reviewed with Campbell. (Id.). Campbell also requested new leg braces and the provider placed a request for the same. (Id.).

The following week, Williams met with Campbell. (Id. ¶ 32). Williams noted Campbell had repeatedly asked for the results of the scrotal ultrasound and those had been provided to him on three occasions. (Id.). Williams educated Campbell on the consultation process and role of UM. (Id.).

Williams next evaluated Campbell on July 28, 2022. (Id. ¶ 33). Campbell had severe muscle wasting of the upper and lower extremities and was wheelchair bound. (Id.). He described his CMT disease as "very painful." (Id.). Williams noted that Campbell's Ultram/Tramadol was discontinued, but after discussion with the pain management team, it would be reinstated. (Id.). Campbell again requested to see a urologist due to scrotal pain, but the previous request was denied, and the recent ultrasound only showed a hydrocele. (Id.). That same day, Williams submitted another consultation request for a urologist. (Id. ¶ 34). Dr. Bartels returned an ATP on August 5, 2022, again finding that medical necessity for the consultation had not been established. (Id.). Bartels explained that a hydrocele is a benign condition and Campbell's ADLs had not been objectively impeded. (Id.). She suggested scrotal support and over the counter non-narcotic pain medications. (Id.).

On September 22, 2022, Williams evaluated Campbell again, noting that Campbell complained that his prescription for Neurontin/Gabapentin had expired although he was

still receiving it. (2d Temesgen Decl. ¶ 7, ECF No. 54-1). Williams renewed the prescription. (Id.). Campbell had muscle wasting in both the upper and lower extremities and walked with a cane. (Id.).

On October 29, 2022, Campbell was seen for a sick call regarding his leg braces and request to see the podiatrist. (Id. ¶ 10). A request for rescheduling of the podiatry consult was noted, but no request for replacement of his shoe straps was in his file. (Id.). Campbell was directed to follow up with his chronic care provider. (Id.).

Dr. Williams next saw Campbell on December 2, 2022, when he complained of continued pain in his extremities. (Id. ¶ 11). Williams agreed to increase the Ultram/Tramadol prescription to 50 mg three times per day and to continue the Neurontin/Gabapentin prescription at 600 mg, two tabs twice per day. (Id.). The medications were both non-formulary and Dr. Temesgen approved them on December 5, 2022. (Id.).

On February 21, 2023, Campbell was found unresponsive in his housing unit. (Id. ¶ 13). When he did not respond to Narcan, Campbell was rushed to the emergency room at Howard County General Hospital, where he stayed from February 22 until February 24, 2023. (Id. ¶ 14). Diagnostic testing and Campbell's relevant medical history suggested that he had suffered a seizure. (Id. ¶ 15). An MRI revealed mild cervical spine disease, which could explain Campbell's neck discomfort. (Id.). Dr. Eric Aldrich, a neurologist, recommended that Campbell take Keppra 1000 mg twice daily and that Campbell's Ultram/Tramadol be stopped due to its side effect of lowering seizure threshold. (Id.). Aldrich noted that Campbell's chronic lower extremity and neck pain were neurological

and that Campbell had been taking Neurontin/Gabapentin 1200 mg twice daily and Ultram/Tramadol. (Id.). As an alternative to Ultram/Tramadol, Aldrich recommended that Campbell increase Neurontin/Gabapentin to 1200 mg with breakfast and dinner, add an additional 600 mg dose with lunch, and take Tylenol around the clock. (Id.). The record reflects that there was extensive discussion among the physicians and Campbell, and everyone agreed that he should avoid stronger opiates due to the potential for addiction. (Id.). As to CMT disease, he was to continue with ambulatory support, Neurontin/Gabapentin and Tylenol. (Id.).

On February 24, 2023, Campbell was discharged from the hospital and admitted to the prison infirmary. (Id. ¶ 16). Dr. Ayelew evaluated Campbell on February 27, 2023 in the infirmary. Ayelew prescribed Campbell Keppra and discontinued Ultram/Tramadol. (Id.). Ayelew's treatment plan included follow up with the onsite medical doctor and scheduling a neurology clinic follow up. (Id.). He was discharged to the general population. (Id.).

On March 8, 2023, Campbell was seen by Dr. Yonas Sisay who reviewed the hospital notes, findings, and recommendations. (Id. ¶ 17). Sisay's examination showed weakness in both legs, ankles, and feet with atrophy; a drop foot brace; high foot arches; gait changes; atrophy; early minimal contraction of hands; and decreased sensation the legs. (Id.). Sisay adjusted Campbell's Neurontin/Gabapentin prescription, refilled his other medications, discussed the April 2022 scrotal ultrasound, submitted a request to replace the foot drop brace straps, and submitted a referral for dermatology. (Id.). Dr. Temesgen approved the request for Neurontin/Gabapentin 600 mg on March 9, 2023. (Id.).

Temesgen was the Regional Medical Director ("RMD") at Corizon Health, Inc., for the Jessup Region, including JCI, from January 1, 2019, to May 4, 2022; and on May 5, 2022, he became the RMD when YesCare took over the health care contract. (Temesgen Decl. ¶ 2).

Temesgen explains that he is not part of the UM team. (Id. ¶ 5). Onsite providers submit consultation requests to UM for offsite appointments, procedures, and diagnostic tests. (Id.). A Physician Reviewer reviews the request and determines whether to approve, deny, request additional information, or offer an ATP. (Id.).

Temesgen does not review consultation requests and avers that he never denied an MRI, urology appointment, or any other medical care for Campbell. (Id. ¶¶ 5, 35). Temesgen did not review the consultation requests or make any determinations regarding those requests as he is not part of UM. (Id. ¶ 35). Temesgen further avers that neither Corizon nor YesCare have or had a policy to deny medical care in order to save or reduce costs. (Id.).

Additionally, Temesgen explains that he is part of the Pain Committee, a panel that reviews patients who suffer from chronic pain and provides treatment plans. (Id. ¶ 6). As a member of the Pain Committee, Temesgen cannot unilaterally order a patient to start or stop any pain medication—those decisions are made by consensus. (Id.). In his first affidavit, Temesgen averred that his only involvement in this case was agreeing with other Pain Committee members to renew Campbell's prescription for Ultram/Tramadol on July 28, 2022. (Id. ¶¶ 7, 35). Temesgen stated that he did not know when or why that prescription was discontinued, and he could not find any record of it being stopped other than the

Medication Administration Records (MAR), which showed that Ultram/Tramadol was stopped on May 30, 2022, and the June MAR, which indicated that Ultram/Tramadol was discontinued. (Id. ¶ 7).

In his Second Affidavit, Temesgen explains that while he did not discontinue Campbell's prescription, further review of Campbell's records demonstrates that on May 17, 2022, Temesgen denied Dr. Williams' non-formulary drug request ("NFDR") for Ultram/Tramadol. (2d Temesgen Decl. ¶ 3). Williams submitted an NFDR for Ultram/Tramadol on May 17, 2022, renewing Campbell's prescriptions for Ultram/Tramadol and Neurontin/Gabapentin from May 16, 2022 to September 16, 2022. (Id.). Both medications are non-formulary medications, and therefore must be approved by the RMD. (Id.). Temesgen approved the NFDR for Neurontin/Gabapentin but denied the NFDR for Ultram/Tramadol. (Id.). He explains that he overlooked the denial of the NFDR because of the way that he searched and reviewed Campbell's medical records. (Id.).

Temesgen explains that he denied the NFDR for Ultram/Tramadol on May 17, 2022 for two reasons. (Id. ¶ 4). First, a number of inmates had overdosed and were sent to the emergency room with altered mental status. As such, efforts were made based on safety and security concerns to reduce the overall use of opioids in the correctional setting. (Id.). Second, Ultram/Tramadol reduces the threshold for seizures. (Id.). Campbell has a history of traumatic brain hemorrhage and subdural hematoma after a skull fracture in 1997. (Id.). As such, Campbell had a higher risk for seizures while taking Ultram/Tramadol. (Id.).

The Pain Committee renewed Campbell's Ultram/Tramadol prescription on July 28, 2022, and Campbell had a seizure in February of 2023, which resulted in his hospitalization

and a recommendation that Ultram/Tramadol be stopped due to its side effect of lowering seizure threshold. (Id.).

Temesgen was not Campbell's provider and did not examine him or order any treatment. (Temesgen Decl. ¶ 35). Further, Temesgen did not have any involvement in the request for a long-handled toothbrush, which would be subject to custody staff's approval. (Id.).

## D.      **Procedural History**

Campbell, proceeding pro se, filed a letter with the Court on August 1, 2022, which was construed as a civil rights complaint alleging denial of medical care. (ECF No. 1). The Court directed Campbell to file a Supplemental Complaint, which he did on September 2, 2022. (ECF No. 3). Campbell alleged that Defendants Temesgen, Warden Robert Dean, Corizon Healthcare, and YesCare failed to provide adequate medical care. (Id.).

On December 6, 2022, Dean filed a Motion to Dismiss, or Alternatively, for Summary Judgment. (ECF No. 19). Campbell filed an Opposition on December 19, 2022. (ECF No. 27), and Dean filed a Reply on January 28, 2023. (ECF No. 33). On February 21, 2023, Medical Defendants Corizon Healthcare and YesCare filed a Motion to Dismiss or, Alternatively, for Summary Judgment. (ECF No. 38). They also filed a Supplement to their Motion on February 23, 2023. (ECF No. 39). Campbell filed an Opposition on May 8, 2023. (ECF No. 47), and Medical Defendants filed a Reply on July 3, 2023. (ECF No. 54). Campbell also filed a Motion to Dismiss Defendants' Motions on July 28, 2023 (ECF No. 57), which shall be denied and construed as a supplement to his Oppositions.

## II.    DISCUSSION

**A.    <u>Standard of Review</u>**

**1.    Conversion**

Defendants' Motions are styled as motions to dismiss under Federal Rule of Civil

Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of

Civil Procedure 56. A motion styled in this manner implicates the court's discretion under

Rule 12(d) of the Federal Rules of Civil Procedure. <u>See</u> <u>Kensington Vol. Fire Dep't, Inc.</u>

<u>v. Montgomery Cnty.</u>, 788 F.Supp.2d 431, 436–37 (D.Md. 2011), <u>aff'd</u>, 684 F.3d 462 (4th

Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to

and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for

summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete

discretion to determine whether or not to accept the submission of any material beyond the

pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby

converting the motion, or to reject it or simply not consider it.'" <u>Wells-Bey v. Kopp</u>, No.

ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright &

Miller, <u>Federal Practice & Procedure</u> § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two

requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice

and a reasonable opportunity for discovery. <u>See</u> <u>Greater Balt. Ctr. for Pregnancy Concerns,</u>

<u>Inc. v. Mayor of Balt.</u>, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly

captions its motion "in the alternative" as one for summary judgment and submits matters

outside the pleadings for the court's consideration, the parties are deemed to be on notice

that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998)).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." Id. (quoting 10B Wright,

Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

Nonetheless, a Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)).

Here, the Court concludes that both requirements for conversion are satisfied. Campbell was on notice that the Court might resolve the Motions under Rule 56 because Defendants styled their Motions in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, the Court informed Campbell about the Motions and the need to file an opposition. (ECF Nos. 22, 45). In his Oppositions, Campbell did not request more time to conduct discovery. Accordingly, the Court will treat the Motions as motions for summary judgment and will consider documents outside of Campbell's Complaint in resolving Defendants' Motions.

### 2.    Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372,

380 (2007)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute

concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (quoting Anderson, 477 U.S. at 247).

**B.    Analysis**

### 1.    Denial of Medical Care

Campbell alleges that Defendants failed to provide him adequate medical care. (Compl. at 1). The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const. amend. VIII; Gregg v. Georgia, 428 U.S. 153, 173 (1976). To sustain a claim for denial of medical care under the Eighth Amendment, a plaintiff must show that the defendant's acts or omissions were done with deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King

v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); accord Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Heyer, 849 F.3d at 210 (quoting Iko, 535 F.3d at 241); see also Scinto v. Stansberry, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendant was subjectively reckless in treating or failing to treat the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). Indeed, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment." Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (citation omitted). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendant knew about the problem. Scinto, 841 F.3d at 226. This includes

evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id.

Mere negligence or malpractice does not rise to a constitutional level. Donlan v. Smith, 662 F.Supp. 352, 361 (D.Md. 1986). "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" Scinto, 841 F.3d at 225 (quoting Farmer, 511 U.S. at 835) (alteration in original); Russell v. Sheffer, 528 F.2d 318, 318–19 (4th Cir. 1975) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim").

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew of at the time. See Lightsey, 775 F.3d at 179 (physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011).

The record before the Court demonstrates that Medical Defendants were not deliberately indifferent to Campbell's medical needs. The evidence shows that Dr. Temesgen was not part of UM, and as such, did not review consultation requests and was

not responsible for the denial of the request to see a urologist, the request for an MRI, or

for a long-handled toothbrush. (See Temesgen Decl. ¶¶ 5, 35).

As to Campbell's complaints regarding the denial of referral to a urologist, the

record shows that a urology consultation request was submitted on January 27, 2022, and

that the UM reviewer requested additional information. (Id. ¶ 25). That information was

provided, but the UM reviewer, Dr. Bartels, determined that no medical necessity was

demonstrated. (Id.). Nevertheless, Bartels recommended that Campbell's medical history

be reviewed to ensure that diagnostic imaging had not already been done. (Id.). On

February 11, 2022, another provider requested a testicular ultrasound which was ultimately

approved, and the result was "unremarkable." (Id. ¶¶ 27, 29). On July 28, 2022, Dr.

Williams submitted another request for urology consultation. (Id. ¶ 34). Bartels, the UM

reviewer, again found no medical necessity for the referral because Campbell's ultrasound

was unimpressive, the hydrocele was a benign condition, and Campbell's ADLs had not

been impeded. (Id. ¶¶ 34–35). Throughout this period of time, Campbell was provided

antibiotics, analgesic pain medication, diagnostic testing, and scrotal support. (Id.). The

record makes clear that despite Campbell's disagreement with Bartel's decisions, Dr.

Temesgen was not involved in the denial of the consultation request. (Id.).

As to Campbell's complaints regarding the denial of an MRI, there is no evidence

that a request for an MRI was submitted by Campbell's medical provider, and even if there

had been, Temesgen would not have been responsible for reviewing the request. (Id.; 2d

Temesgen Decl. ¶ 6). Additionally, the record evidence shows that Campbell received an

MRI as a result of his emergency hospitalization following a seizure, and it showed mild

cervical disease that was were treated with the same analgesic pain medication he was already taking. (2d Temesgen Decl. ¶ 15).

Regarding the recommendation that Campbell would benefit from the use of a long-handled toothbrush, again the record demonstrates that Temesgen was not responsible for the denial of a long-handled toothbrush. Long-handled toothbrushes are not permitted due to a statewide DPSCS policy that prohibits them due to the ability to turn such an item into a weapon. (Temesgen Decl. ¶ 10). Campbell was referred to an occupational therapist to assist him in grasping his toothbrush and correctional staff were provided with material to modify Campbell's state-issued toothbrush in order for Campbell to be independent in brushing his teeth. (Id.). There is no evidence that Temesgen was in any way involved in approving a long-handled toothbrush, or that he had the ability to provide one against state-wide correctional policy.

Lastly, as to Campbell's claim that his prescription for Ultram/Tramadol was discontinued by Temesgen, the record does demonstrate that Temesgen declined the request to renew Campbell's non-formulary prescription for Ultram/Tramadol. Temesgen explains that he declined the NFDR due to increased concerns about the use of opioids in the correctional setting as well as the specific increased risk to Campbell of his suffering a seizure with continued use of Ultram/Tramadol. (2d Temesgen Decl. ¶ 4). However, although the medication was discontinued, during the relevant time, Campbell still received Neurontin/Gabapentin as analgesic medication. (Id. ¶¶ 11, 17, 19). After Campbell complained of the increased pain upon the discontinuation of Ultram/Tramadol, the medication was approved and renewed. (Id. ¶¶ 3–4). Further, the record reflects that after

Campbell's Ultram/Tramadol was renewed, he suffered a seizure, as Temesgen had feared, and thus the prescription for Ultram/Tramadol was again discontinued. (Id.). While the Court is sympathetic to Campbell's complaints of increased pain after the initial stopping of Ultram/Tramadol, Temesgen has presented evidence that the decision to not renew the medication was based on his professional belief regarding Campbell's best interests, and when Campbell's physicians discerned that his pain was not managed well without the Ultram/Tramadol, they restarted the medication. On this record, the Court cannot say that Temesgen was deliberately indifferent to Campbell's serious medical needs.

### 3.    Supervisory Liability

In a suit arising under 42 U.S.C. § 1983, the doctrine of respondeat superior generally does not apply and liability attaches only upon a defendant's personal participation in the constitutional violation. See Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985); see also Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. See Austin v. Paramount Parks, Inc., 195 F.3d 715, 727–28 (4th Cir. 1999); Clark v. Md. Dep't of Pub. Safety and Correctional Servs., 316 Fed.Appx. 279, 282 (4th Cir. 2009).

Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

Campbell does not allege any facts suggesting that Defendants Warden Dean or YesCare were personally involved in or otherwise aware of the decisions regarding the provision of medical care to Campbell. To the contrary, Dean avers that a private medical contractor is responsible for providing medical services to JCI inmates; therefore, Dean had no authority to make decisions or recommendations about medical care, order medical staff to render any treatment, or monitor the provision of medical services to inmates. (Dean's Decl. ¶ 5). Instead, when an inmate complained about medical care, Dean "relied on the reports, assessments and judgments of the contractor's trained medical staff to prepare any response for [his] signature." (Id.). For these reasons, Campbell has not established Dean's supervisory liability, and Campbell's claims against Dean must be dismissed.

As to YesCare, while Campbell claims that YesCare employees denied referrals to outside providers in order to save money, there are no facts to support that assertion. To the contrary, Dr. Temesgen avers that there is no such policy, and the record evidence

demonstrates that Campbell was routinely provided specialty services including treatment and evaluation by outside providers, diagnostic testing, occupational therapy, mobility aids and devices, and non-formulary medication. (2d Temesgen Decl. ¶ 5). For these reasons, YesCare is entitled to dismissal.

### III.    CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF Nos. 19, 38, 39) will be granted and Campbell's Motion to Dismiss (ECF No. 57) will be denied. A separate Order follows.

Entered this 6th day of September, 2023.

_____/s/_____
George L. Russell, III
United States District Judge
